**STUDENTS BOOK COMPANY,**
Appellant,

v.

**WASHINGTON LAW BOOK COM-PANY,** Appellee.

**No. 12563.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 6, 1955.

Decided Dec. 1, 1955.

Certiorari Denied March 12, 1956.

See 76 S.Ct. 474.

Mr. Nathan L. Silberberg, Washington, D. C., for appellant.

Mr. William E. Leahy, Washington, D. C., with whom Messrs. William J. Hughes, Jr., and Ben Ivan Melnicoff, Washington, D. C., were on the brief, for appellee.

Before EDGERTON, Chief Judge, and BAZELON and FAHY, Circuit Judges.

BAZELON, Circuit Judge.

Appellant sued for treble damages for injuries allegedly caused by appellee's sales of student law books to appellant's

competitors at preferential prices and under preferential terms in violation of the Robinson-Patman Act.[1]

Appellant operates a retail store supplying law books and other supplies to law students. Appellee, majority owned by the West Publishing Company of Saint Paul, Minnesota, is the exclusive distributor in Washington, D. C., of West and some other publications. It is the source of between 80 and 90 per cent of the books used by law students in the Washington area. Before the fall of 1947, it supplied books to appellant at a discount of 20 per cent off list price and allowed appellant to return all unsold books for full credit. This is the usual and customary basis for distribution of student law books and other books in the educational field.

In 1947, appellee-seller informed appellant-buyer that, beginning with the fall semester, the discount would be cut to 6 per cent and returns would no longer be permitted. However, the appellee-seller thereafter allowed more favorable terms to the campus book stores of various Washington law schools.[2] This is the discrimination of which appellant complains.

The Robinson-Patman Act makes it unlawful to discriminate between "purchasers of commodities * * * for * * * resale" as to price[3] or as to services or facilities.[4] Appellee's defense was that the statute is inapplicable because, while appellant was a *purchaser* of its books, the campus book stores were only *agents* selling books for appellee and receiving a commission therefor.[5]

1. 38 Stat. 730 (1914), as amended, 49 Stat. 1526-27 (1936), 15 U.S.C. § 13 (a) and (e).

2. Up to September 1951, the Howard University book store was permitted to return unsold books although its discount, like appellant's, was only 6 per cent. After September 1951, its discount was raised to 20 per cent. The George Washington University book store began carrying law books in September 1951 and has since enjoyed a 20 per cent discount and a right of return. The Washington College of Law became part of American University in the fall of 1949 and since then the American University book store has carried appellee's books at a 20 per cent discount with the right of return.

3. 15 U.S.C. § 13(a) provides:
"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchasers involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of

commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *."

4. 15 U.S.C. § 13(e) provides:
"It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

5. Appellee also argues that, even if its transactions with the campus book stores were sales, they were exempted from the application of the Robinson-Patman Act by virtue of 52 Stat. 446, 15 U.S.C. § 13c, which provides:
"Nothing in sections 13-13b * * * of this title shall apply to purchases of their supplies for their own use by schools, colleges, universities, public libraries, churches, hospitals, and charitable institutions not operated for profit."
Although the appellee has sold books to all three of the universities for their own use, *i. e.*, for their libraries, the transactions here in question were not actually with the universities, but with

With respect to one of the allegedly competitive book stores, that at Howard University, appellee's president admitted that its deliveries of books were sales up to September 1951, but asserted that subsequent transactions were consignments. The manager of the Howard store testified, however, that the only change that occurred in September 1951 was a change in the discount from 6 to 20 per cent. Orders were placed in the same manner, billing and invoicing were unchanged, the method of payment was the same, unsold books were returned for credit against future purchases, just as before. So far as he was aware, he had never been a consignment agent for appellee.

A second alleged competitor, the George Washington University book store, rendered periodic "consignment sales" reports to appellee for books received. But the assistant comptroller of

the University testified that, as to the 20 per cent which the store made on each book sold, he did not know "whether you would call that handling them on commission or not." At an earlier trial, he testified, "I wouldn't call it a commission."[6]

Thus there was a conflict in the evidence from which the jury could have found that the transactions with the campus book stores were either consignments or sales. To enable the jury to resolve this conflict, the court charged, in essence, that if title to the books passed to the campus book stores, they were purchasers, but that if title did not pass to them, they were merely consignment agents.[7] Since the jury's verdict sustained the defense, it must have found that the transactions were consignments.

■ The primary question on this appeal is whether the trial court erred in denying appellant's request for two instructions. The first relates to certifi-

the self-sustaining campus book stores, and the books sold were not for the use of the universities, but for resale at a profit. The exemption provision is therefore inapplicable to these transactions.

6. No testimony was received from the third campus store involved, American University.

7. In pertinent part, the charge was:
"The defendant claims, however, that while it did consign to certain parties, as its agents, law books on different terms from which it offered to sell to the plaintiff, that the relationship between the defendant and those dealers, other than the plaintiff, was that of principal and agent; that the property was not sold to these dealers, but merely consigned to them for sale.

"Now what is a sale and what is a consignment? A sale of goods is an agreement whereby the seller transfers the property in goods or the owner of the goods to the buyer for a consideration called the price.

"Were these books sold to these other dealers, that is, the college book stores, or were they merely transferred to them for sale, or consigned, as the term has been used in this case? That is the question for you to determine, taking into consideration all the evidence in the case.

"The defendant claims that these books were consigned to these other dealers, the college book stores, and not sold to them; that there was a discount allowed to them for their sale, some 20 per cent and a privilege of returning those which were not sold.

"The fact that there was this privilege of returning is not conclusive one way or the other on whether it was a sale or not. It might be consistant with a consignment.

"It is for you and you only to decide this question of fact, taking all the facts into consideration. Did the defendant sell law books to these other dealers at a price different from that which he was willing to sell to the plaintiff, or were these books merely consigned to these other dealers as agents to sell?

"Now consignment does not imply a sale, but imports an agency, and the title or ownership remains in the seller. Where in the case of a sale the title passes to the buyer.

"Take all this into consideration and determine whether or not the title to these law books remained, title and ownership, remained in the defendant when they were sent to these other dealers—When I say 'other dealers' I mean the college book stores, of course—or whether the title passed to these dealers and they became the owners with the privilege of returning those which were not sold."

cates which the campus book stores executed under the District of Columbia Sales Tax Law to exempt appellee from collecting and paying sales taxes, and in which they represented that they were purchasers for resale from appellee:

"Plaintiff's Request No. 3

"Under the District of Columbia Sales Tax Law, the definition of 'retail sale' laid down by Congress specifically excludes any sales to one who re-sells those goods. That law also provides that a re-seller's exemption certificate must be obtained by the vendor or the vendor is liable for the sales tax. (47 D.C.Code 2601 (14a), 2607) These definitions under our Sales Tax Law may be considered by you in deciding whether Defendant was merely a retailer of these student books or a distributor to the stores which actually made the sales to the students."

The second relates to the distinction between consignment and sale:

"Plaintiff's Request No. 5

"There has been testimony by Defendant that it did not sell books to some of the college stores, but merely consigned them. Now it is for you to determine whether, in truth, those were sales or consignments. There were no contracts between those parties so you must judge from the manner in which the arrangement operated. 'The term "consign" . . . may express the true state of the case . . . or it may be a mere subterfuge, and if it be the latter, there is no magic in that word which can take from the transaction its real character,' (1 Mechem on Sales 43; Butterick

v. F.T.C. [2 Cir.] 1925, 4 F.2d 910; Standard Patterns [Fashion Co.] v. Magrane-Huston [Co.], 1922, 258 U.S. 346 [42 S.Ct. 360, 66 L.Ed. 653]; In re Wells, D.C.Pa., 140 F. 752)."

■ My colleagues are of the view that the first quoted request is too involved and obscure for its rejection to furnish ground for reversal, especially as it was not necessary for the court to pinpoint this aspect of the evidence in charging the jury. As to the second quoted request, they are of the view that the charge given by the court told the jury, in effect, that they were to decide whether the transactions were sales or consignments upon the whole evidence, without giving undue weight to the fact that the parties to the transactions sometimes used the word "consign." Accordingly, they find no error affecting substantial rights. The judgment below must therefore be affirmed.

I think, however, that denial of the requested instructions is error requiring a new trial. I state my reasons.

The trial court's instruction on the difference between a "consignment" and a "sale" was correct as far as it went, but in light of the evidence there was a plain need for elaboration.

The evidence in this record justified an instruction that the jury's choice was not restricted to that between *unconditional* sale and mere agency but that it might find the transactions between appellee and the campus book stores were *conditional* sales or "sale or return" arrangements in which "title passes to the purchaser subject to his option to return the property within a time specified or a reasonable time."[8] The jury needed to be told not only that sale depends upon

8. Sturm v. Boker, 1893, 150 U.S. 312, 328, 14 S.Ct. 99, 104, 37 L.Ed. 1093. Cf. D.C.Code, §§ 28–1101, 28–1203, Rule 3(1) (1951).

Appellee's president testified:

"Q. You told about the returns. When could they return books to you, American University, that is, the book store? A. Mr. Silberberg, I am not too familiar with that phase of our business. I suppose in many times it was reasonable. I don't think there was any hard and fast rule in our dealings with the law schools because sometimes if there is delay we make exceptions and allow books to be returned, particularly oftentimes there is a new edition published and we have to take up the older edition. Sometimes there is a little delay in a transaction of that sort."

passage of title but also what the indicia of title are, *e.g.*, the exercise of dominion over the goods.[9] It is not always easy, even for a court, to decide whether a transaction is a sale or an agency.[10] Where that question is entrusted to a jury, the charge should contain substantially the criteria which the court would invoke in resolving the question without a jury. The instant charge, in defining a sale, uses the language of subparagraph (2) of the first section of the Uniform Sales Act,[11] but does not refer to the provision in subparagraph (3) that "a sale may be absolute or conditional."[12] The only recognition of this provision in the charge is this statement:

> "The fact that there was this privilege of returning is not conclusive one way or the other on whether it was a sale or not. It might be consistent with a consignment."

Though the jury was told that the privilege of returning goods might be consistent with a consignment, it was not told that there is a well-recognized class of sales in which title vests in the buyer upon delivery subject to divestment upon return of the goods,[13] or that, in this type of case, the locus of title is tested "not so much from the standpoint of the sender (bailor or seller) as from that of the receiver (bailee or buyer)."[14]

The instructions requested by the plaintiff and denied by the trial court do not, of course, articulate all the foregoing criteria applicable to the jury's consideration of the evidence. But they do supply some of the much needed elaboration which I have described.

Under the instruction relating to "consignment" versus "sales" which the trial court denied, the jury would have been advised that the recurring use of the word "consignment" in the documents did not preclude a finding that the transactions were, in fact, sales.[15] The jury would also have been advised that, since use of the word "consignment" in the documents is not controlling, it should consider "the manner in which the arrangement operated," *i.e.*, "the acts and circumstances of the parties, especially * * * the construction which they themselves put upon the contract in executing it."[16] Pertinent in this connection is the denial of the instruction which reflected the fact that the various campus book stores had represented themselves to be *resellers* of appellee's books under the District of Columbia Sales Tax

**9.** Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 354, 42 S. Ct. 360, 66 L.Ed. 653.

Appellee's president testified, as to the books delivered to the campus book stores:

"* * * we get paid as they sell the books * * * They had a large supply of books on hand left over. Those books they had on hand they could sell them and account for them or they could return them or do what they pleased with them. We never get paid until they make their sales to the students and then they make an accounting and pay us."

**10.** Dryden v. Michigan State Industries, 8 Cir., 1933, 66 F.2d 950, 953, quoting Marrinan Medical Supply v. Fort Dodge Serum Co., 8 Cir., 1931, 47 F.2d 458, 460:

"* * * in recent times, the real or supposed needs and exigencies of business and the ingenuity of business men and of their lawyers have evolved a class of contracts which have the earmarks of both sale contracts and factorage contracts. It is not always easy to determine into which class a particular contract falls."

**11.** D.C.Code, § 28–1101(2) (1951): "A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the 'price.'"

**12.** Id., § 28–1101(3).

**13.** Id., § 28–1203, Rule 3(1).

**14.** Dryden v. Michigan State Industries, 8 Cir., 1933, 66 F.2d 950, 953.

**15.** Ferry & Co. v. Hall, 1914, 188 Ala. 178, 66 So. 104, L.R.A.1917B, 620; see also Samson Tire & Rubber Co. v. Eggleston, 5 Cir., 1930, 45 F.2d 502, 504.

**16.** Samson Tire & Rubber Co. v. Eggleston, supra; see also McCallum v. Bray-Robinson Clothing Co., 6 Cir., 1928, 24 F.2d 35, 36.

Law[17] by filing exemption certificates with the appellee. Upon the state of this record, I think both of the denied instructions would have provided information essential to the jury's consideration.

Appellee argues that, even if the charge is inadequate, the judgment must be affirmed since appellant failed to prove any damages. This argument springs from the fact that the discriminatory treatment, in large part, began at the same time that the campus book stores began to compete with the appellant. This, it is said, demonstrates that appellant's loss of business resulted from the competition rather than the discrimination. It is undeniable, and appellant admits that, with the opening of a campus store, some students, formerly buying from appellant, found it more convenient to buy from the campus store, especially since both sold at the same prices. Nevertheless, there is some evidence in the record that other students continued to buy their supplies from the appellant even after competition from the campus stores began and that their patronage was not lost until appellant ceased to stock appellee's law books. And there is ample evidence that it was the discrimination that prevented appellant from stocking appellee's books.[18] Thus, it cannot be said that there is no evidence in the record from which a jury could find that appellant was damaged by the discrimination.

There is, of course, no accurate way of determining the amount of appellant's loss due to competition as against the amount due to discrimination. But the "rule which precludes the recovery of un-

certain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."[19]

The problem is not a new one. In damage suits brought under the antitrust laws, the Supreme Court has held that the nature of the subject matter is such that the jury must be allowed to base its determination of damages upon "probable and inferential" proof.[20]

Affirmed.

---

17. D.C.Code, § 47–2601, subd. 14(a), as amended (Supp.1954); D.C.Code, § 47–2607 (1951).

18. The record shows that student law books are often replaced in school curricula so that a dealer, unless he has a right to return unsold copies for credit, stocks them at his peril. Indeed, the evidence shows that appellant would lose his profit on sixteen books for every book remaining unsold. His competitors enjoy not only the right to return, but also a 20 per cent profit margin, as compared to his 6 per cent margin.

19. Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544.

20. Bigelow v. RKO Radio Pictures, 1946, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L. Ed. 652; see also Eastman Kodak Co. of New York v. Southern Photo Materials Co., 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Story Parchment Co. v. Paterson Parchment Paper Co., supra.